FILED

12/07/2016

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. LEOPOLD MPAWINAYO**

**Appeal from the Criminal Court for Davidson County
No. 2013-D-2982, 2013-D-3155     Mark J. Fishburn, Judge**

————————————————

**No. M2016-00778-CCA-R3-CD**

————————————————

After a bench trial, the trial court found the Defendant, Leopold Mpawinayo, guilty of two counts of violating the habitual motor vehicle offender law and sentenced him to three years for each conviction, ordering that the sentences be served consecutively and on probation. The Defendant's probation officer filed an affidavit asserting that the Defendant had violated his probation by being arrested for aggravated assault with a deadly weapon and by failing to pay his probation fees and court costs. The trial court held a hearing and found that the Defendant had violated his probation. The trial court ordered intensive probation with GPS monitoring. Shortly thereafter, police arrested the Defendant for four counts of aggravated assault. The trial court held a hearing and found that the Defendant had again violated his probation. The trial court revoked the Defendant's probation and sentenced him to serve one year, at 100%, followed by a new six-year period of intensive supervised probation, with additional requirements. On appeal, the Defendant contends that the trial court erred when it revoked his probation and when it added additional conditions to his probation. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, JJ., joined.

Taylor I. Bearman, Nashville, Tennessee, for the appellant, Leopold Mpawinayo.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Robert W. Mitchell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's alleged violation of his probation for a 2015 traffic-related conviction. On November 8, 2013, a Davidson County grand jury indicted the Defendant for two counts of violating the habitual motor vehicle offender law. The judgments of conviction indicate that, on April 20, 2015, the trial court convicted the Defendant of both offenses. The trial court sentenced the Defendant to three years for each conviction. It ordered that the Defendant's sentences be served on supervised probation and be served consecutively to one another. The trial court entered the probation order on May 29, 2015.

On September 11, 2015, the Defendant's probation officer filed an affidavit alleging that the Defendant had violated his probation on September 9, 2015, by being arrested for aggravated assault with a deadly weapon and by not paying his probation fees or court fines. The trial court issued a warrant and held a hearing. The record indicates that the trial court sustained the Defendant's violation of probation. It restarted his probation and, in an amended judgment, ordered the Defendant to "intensive probation." The amended judgment, entered November 10, 2015, showed the trial court's additional requirements that the Defendant wear a GPS monitor, have a 6 p.m. curfew, and stay away from the victim of the assault, the Defendant's wife.

On December 2, 2015, the Defendant's probation officer filed an affidavit alleging that the Defendant had violated his probation on November 11, 2015, by being arrested for four counts of aggravated assault with a deadly weapon for pointing a gun at his children. The trial court held a hearing on this affidavit during which the following evidence was presented: The parties agreed the charges had been reduced to domestic assaults and were pending. There had been a preliminary hearing on the charges. The parties stipulated to the admissibility of the Defendant's interview with police and also to interviews with two of his children, who were witnesses to the alleged assault, as well as the recording of the preliminary hearing testimony.

In the interview, the police officer, who was not identified on the video[1], read and went over each of the Defendant's rights with him. The Defendant acknowledged that he understood these rights, and he signed a form waiving his rights. The Defendant expressed to the police officer that he did not know what he had done wrong. The Defendant said that he had not consumed any alcohol or drugs in the previous twenty-four hours, that he had completed high school, and that he was taking college courses. The police officer informed the Defendant that he had spoken with the Defendant's children who told him about an incident that occurred after the Defendant and his

---

[1] During the preliminary hearing, Detective Kelly Cantrell identified this officer as Gabe Ace Bido (spelled phonetically), who worked in the youth services division.

2

children returned from juvenile court the week before. The Defendant described the incident saying that his sixteen-year-old daughter had mental issues. He had tried to tell her not to put her hands on other people. He said that his daughter had engaged in multiple instances of violence, putting her hands on other kids, threatening a bus driver with a knife, and more. He told her that she was young and needed to be smart and stay in school. He said he described for her how he had just been released from jail and how she needed to be there for him and not in jail herself.

The Defendant said that he had a fake gun, a BB gun, in the home. He said that his daughter knew that the gun was not real. The Defendant said he told his daughter that if she kept putting her hands on other people that the other people were going to shoot and kill her. The Defendant said that his daughter jumped and seemed scared when he pointed the weapon at her but he said he told her to calm down and that he was not going to hurt her. The Defendant said he showed his children videos of his home country of Africa and of other places where children had been killed. The Defendant said that this was the end of the incident and that, since then, his daughter had come to him and apologized and said that she would no longer put her hands on anyone. The Defendant said that he was simply trying to ensure that his daughter did not go to jail or hurt anyone else.

The Defendant explained that he had the fake gun because he and his friends make movies on the weekends to send back to Africa. He said that this was why he had the ammunition tray and the gun holster. He said that there was a security badge in his home but that it did not belong to him but to a friend. The Defendant said he did not know where the gun was located.

The police officer informed the Defendant that officers were searching his home. He asked the Defendant where the Defendant usually stored the gun. The Defendant said he did not know. The officer informed the Defendant that he had scared all of his children very badly by showing them videos of dead children and by waving the gun at them. The Defendant said that he had only scared one of them, and the detective said that all of the children had been very scared. The Defendant said he was trying to do the right thing and did not know that he had made a mistake.

The Defendant said he was from central Africa and that there had been genocide in his community. The Defendant said he came to the United States in 1998 as a refugee. The Defendant described injuries that he had received by his parents during punishments. He said that his father tied him up and injured his finger to teach him not to injure people. He described how parents would physically hit children who were disobedient in school. The detective said that this was concerning because the Defendant had another assault case pending. The Defendant again said he was trying to do the right thing.

3

The Defendant called his wife and asked her if she had placed the gun anywhere. His wife said that she did not know where it was. The Defendant said that his children used the gun as a play toy and that they knew it was not real and that they were not scared. The Defendant expressed disbelief and anger that he had been charged with aggravated assault.

During the preliminary hearing, Detective Kelly Cantrell identified the video recording of the Defendant's interview, which was admitted into evidence. She also testified that she initiated the warrants in this case. She described the nature of the incidents in this case, saying that it involved threats that the Defendant made using a gun toward the four children in the home. Based upon these actions, there were four warrants for aggravated assault issued against the Defendant.

The detective testified that she spoke with the Defendant's two older children, V.M. and M.M., who were twin sisters. One of the other of the Defendant's children was "non verbal." These conversations were recorded at the Defendant's children's schools the day after the police had been called to the Defendant's home. Based on these interviews and their demeanor, the detective felt the children were in fear, so they initiated arrest warrants against the Defendant for his actions toward each of the four children. Detective Cantrell said that she also obtained a search warrant for the Defendant's home. Officers recovered a canvas handgun holster, a security guard badge, and an empty plastic ammunition box tray. The tray was one that typically holds twenty-five or fifty bullets.

During cross-examination, Detective Cantrell said that she only interviewed the Defendant's two oldest daughters, V.M. and M.M. and did not speak to the other two children. Detective Cantrell said the school had informed her of V.M.'s mental capabilities. She agreed that V.M. had a mental IQ of 67 and behavioral issues. Detective Cantrell agreed that her investigation revealed that V.M. had recently been in juvenile court facing charges.

Detective Cantrell testified that she had no knowledge of when the ammunition tray first was at the home. She said that officers never found a handgun or a fake gun in the home. She agreed she had no evidence to contradict that this was a fake gun and a joke. Detective Cantrell said that none of the children suffered serious bodily injury.

The Defendant's son, B.M., testified that he was fifteen years old and in high school. He recalled an incident the night before Thanksgiving. He said that his family had family meetings frequently, usually on Friday, to help each other with life and school. During this family meeting, after V.M. got into trouble for fighting on a bus, his

4

father showed him videos. He said that the Defendant told the children that V.M. had to go to juvenile court and that they did not want her to live a life of crime. During this meeting, present were V.M., M.M., and B.M. Their other sibling, C.M., was asleep.

B.M. said that his father had a fake gun at the meeting. B.M. said that he knew that this was a fake gun. He said that the Defendant was speaking to the children about how they should not be like him. B.M. said that the Defendant never pointed the gun at any of the children. He said he never feared that the Defendant would shoot the fake gun. During cross-examination, B.M. testified that the Defendant had a crystal belt to hold the gun. B.M. testified that he never took the gun out or waved it around. B.M. denied that the Defendant had a BB gun. B.M. said that V.M. ran out of the room that evening. During redirect B.M. said V.M. never said why she left the room.

M.M. testified that she was sixteen years old at the time of trial. She recalled that the Defendant told the children, V.M., M.M, and B.M, not to mess up their lives like V.M. had done. The Defendant told them not to act violently so that they would not go to jail. At first, the Defendant spoke in a "medium" voice, but he was the type of person who "yells a lot" so he raised his voice. The Defendant showed them videos of people in his country and what they did. M.M. did not remember specifics of the videos.

M.M. said that her father pulled out a "fake gun" that had "gemstone thingies" on it. M.M. said that the gun was small. He held the gun toward the ground and did not point it at any of the children. M.M. testified that V.M. got scared at one point but stayed in the room. M.M. said that, when she spoke with the detective, she told her that the Defendant had a fake gun, and she told her that the Defendant did not wave the gun at them. M.M. said that the detective never asked her if she was scared.

During cross-examination, M.M. said that the point of the family meeting was to tell the children that they should go to school and do good things and not get into trouble. M.M. said that her sister V.M. had a hard time remembering things. One time, their family had to go to court because V.M. had a dream about something that she thought was real. V.M. she said often got confused.

During redirect examination, M.M. said that no one had talked to her about what she should say if she testified.

Detective Cantrell was re-called as a witness and she testified that M.M. told her that when they returned home from V.M.'s court hearing the Defendant was very angry. He spoke with them about not making mistakes and behaving. The detective said that M.M. told her that at some point the Defendant had a gun in his hand and never specified

5

that it was a fake gun. The detective said that M.M. told her that she was afraid and that M.M. thought that the Defendant would shoot them.

Detective Cantrell said that she recorded her conversations with M.M. In the conversation, Detective Cantrell said that she had just left a conversation with M.M. On the recording, much of which is inaudible, M.M. said that the Defendant yelled at them about not getting into trouble. M.M. said that the Defendant showed them some videos to encourage them not to get into trouble. M.M. said that the Defendant did not point a gun at V.M. but that he did wave it at the ground. She said that she was scared.

During cross-examination, the detective agreed that there were three people present while she was interviewing M.M. She agreed that M.M. denied that the Defendant pointed the gun at anyone. Detective Cantrell said that her investigation began based on allegations made by V.M. Detective Cantrell said that she took out a warrant for the fourth child because V.M. said that all four children were present. The detective said that she was unsure whether this was corroborated by M.M.

At the conclusion of the preliminary hearing, and after arguments of counsel, the trial court at the preliminary hearing stated that it considered the witnesses' demeanor as they testified. The trial court said that both the children seemed scared to be in court that day. The trial court noted that M.M.'s testimony contradicted her recorded statements to police. The trial court said that there was at least a domestic assault that occurred that day. She agreed that the witnesses testified that there was not an aggravated assault. She sent all four warrants to the Davidson County grand jury for domestic assault. This concluded the preliminary hearing transcript admitted as evidence in the probation revocation hearing.

After the trial court heard the evidence from the preliminary hearing and the interviews, the parties argued that the Defendant's probation should not be violated. The trial court stated, "Here's the problem I've got; this is the second time that there's been an allegation of a black gun pulled, I want to know where that black fake toy gun is. If your guy wants out of jail, he better cough up the gun." The trial court noted that the Defendant's last aggravated assault arrest was based on the fact that the Defendant "pulled a black semiautomatic handgun and pointed it at [the Defendant's wife]." The trial court noted that now the Defendant's children were saying that he had a black handgun. The trial court implored the Defendant to produce the gun.

A month later, court reconvened, and the Defendant produced a belt buckle that held a fake gun covered on one side with clear rhinestones. The Defendant's attorney noted that B.M. had described the fake gun as being attached to his belt and M.M. said that it had gemstones on it.

6

The State informed the trial court that the Defendant had been arraigned on six counts of aggravated assault as well as felony reckless endangerment. It further noted that he was on probation for two cases and that he was on bond for a DUI when the other indictments were issued. The State asked the court to revoke the Defendant's bond on his pending DUI.

The State noted that the first aggravated assault was based upon the Defendant engaging in an altercation with his wife. He struck her with a closed fist, she threatened to defend herself, and the Defendant produced a handgun. He pointed the handgun at her and said that he was going to kill her. The trial court recalled that the Defendant's wife had come to the first probation revocation hearing to testify. The State noted that the Defendant had a fourth pending DUI charge, in addition to being on probation for two different HMVO violations, for which he was sentenced as a Range II offender.

The trial court found that the Defendant had violated the terms of his probation. He sentenced him to serve one year at 100%. The trial court said the Defendant would then be reinstated to intensive supervised probation. In addition, the trial court ordered the Defendant to wear a GPS monitor, comply with a curfew from 6:00 p.m. to 6:00 a.m., and stay away from his wife. The court confiscated the Defendant's fake gun and gun belt. The trial court ordered that he attend "extensive parenting class[es]" and a twenty-six week anger management program.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it revoked his probation and when it added additional conditions to his probation. He asserts that there is no evidence upon which to base his revocation because there was not substantial evidence at the hearing that the Defendant violated the laws of the United States. He further asserts that the evidence of other potential violations not listed on the probation violation warrant are not relevant to the determination of whether he violated his probation, including the other aggravated assault which was the basis of his previous probation violation. Finally, the Defendant argues that the trial court improperly imposed additional conditions that were "onerous" by ordering him to restart his probation after service of one year at 100%, to have a GPS curfew from 6:00 p.m to 6:00 a.m., to stay away from his wife, and to complete an extensive anger management program. The State counters that the trial court acted properly when it found the Defendant violated his probation and when it imposed additional conditions upon him. We agree with the State.

7

A trial court's authority to revoke a suspended sentence is derived from Tennessee Code Annotated section 40-35-310 (2014), which provides that the trial court possesses the power "at any time within the maximum time which was directed and ordered by the court for such suspension, . . . to revoke . . . such suspension" and cause the original judgment to be put into effect. A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e) (2014). A trial court is not required to find that a violation of probation occurred beyond a reasonable doubt. *Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). The evidence need only show that the court has exercised conscientious judgment in making the decision and has not acted arbitrarily. *Id*. "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). If a trial court revokes a defendant's probation, options include ordering confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. §§ 40-35-308(a), (c), -310 (2014); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). In order for this Court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the conditions of probation has occurred." *Shaffer*, 45 S.W.3d at 554. Further, a finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

We conclude that the trial court did not abuse its discretion when it found the Defendant had violated his probation. The evidence before the trial court included that Detective Cantrell was contacted regarding V.M. She said she interviewed V.M. and M.M. and that they told her that the Defendant had waved a gun at them during a family meeting and that they were scared. During the recorded interview of M.M., which was included in the preliminary hearing testimony, M.M. testified that the Defendant waved a gun at their feet and that she was scared. She did not say that the gun was fake. The Defendant told police officers that he had a black gun that he used as a movie set prop. At some points, he said it was "fake" and at other times said it was a "BB gun." He did not mention rhinestones on the gun, and he simply described it as black. Police found a holster and an empty ammunition tray, designed to hold ammunition for a real gun, at the Defendant's home. They did not find a gun.

8

At the preliminary hearing, M.M. testified that the gun the Defendant waved was a fake gun upon which there were rhinestones and that she was not scared. Her brother, B.M., testified that the Defendant had a fake gun at the time of the family meeting and that he was not scared. At the probation violation hearing, the Defendant produced a belt with a rhinestone covered gun.

The trial court, listening to the evidence, chose to accredit Detective Cantrell's recount of her interview with V.M. and M.M., one of which was recorded. M.M.'s testimony during the preliminary hearing differed from her recorded police interview. Her recorded police interview, however, supported Detective Cantrell's account. The Defendant himself admitted to having a black gun, not a rhinestone covered one, and said that it was a movie prop. This weapon, real or fake, which he said he purchased online was never recovered. The trial court determined that the Defendant's actions of waving a gun at his children placed one or more of his children in fear and that, therefore, there was substantial evidence that his conduct violated his probation. As previously stated the credibility of the witnesses is determined by the trial court, and the evidence supports its finding. The Defendant is not entitled to relief on this issue.

The Defendant next contends that the trial court erred when it imposed additional "onerous" conditions to his probation. The conditions he mentions are: to serve one year at 100%; to restart a six-year term of probation after his release; to have a GPS curfew from 6:00 p.m. until 6:00 a.m.; to stay away from the victim of his first aggravated assault charge, his wife; to complete extensive parenting classes; and to complete a twenty-six-week anger management program. We first note that many of these conditions were not new conditions. In fact, after the Defendant violated his probation the first time, in September 2015, the trial court entered an amended judgment on November 10, 2015, that showed the trial court's additional requirements that the Defendant wear a GPS monitor, have a 6 p.m. curfew, and stay away from a specific woman named in the amended judgment and who was the victim of the assault, namely his wife. The only additional requirements after this second probation violation are: that the Defendant serve one year of incarceration, that he restart his six-year term of probation, that he complete extensive parenting classes, and that he complete an anger management program.

As stated above, the conclusion of a probation revocation hearing, a trial court can: (1) order incarceration; (2) cause execution of the judgment as it was originally entered; or (3) extend the remaining probationary period for a period not to exceed two years. *Hunter*, 1 S.W.3d at 648. Therefore, the trial court's ordering of confinement for one year and its ordering of the Defendant restarting a six-year term of probation are supported by law. We turn to address then, whether the trial court's ordering that the

9

Defendant complete extensive parenting classes and an anger management program were "onerous."

We start with the premise that probation is a privilege, granted to a defendant after he has been found guilty of an offense. *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). "The trial judge is authorized to suspend the sentence and place the defendant on probation subject to such conditions as he may deem fit to impose." *Id.* We note that, after a violation of probation, at which time the trial court has the authority to impose a sentence of incarceration, it may impose additional conditions of probation, as long as they are not harmful to the defendant. "A condition of probation which is shown to be harmful to a particular defendant may be viewed as unreasonable and should be modified." *State v. Perry Eugene Wallace*, No. 01C01-9306-CC-00171, 1993 WL 495293, at *3 (Tenn. Crim. App., at Knoxville, Dec. 2, 1993), *no Tenn. R. App. P. 11 application filed*. However, the burden is upon the defendant to show such circumstances. *Id.* We conclude in this case that the Defendant has not proven that the additional requirements that he attend parenting and anger management classes harm him. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

10